## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

JOSHUA TAYLOR,

        Plaintiff,

        v.

THOMAS DART, et al.,

        Defendants.

Case No. 18-CV-1078

Judge John Robert Blakey

## MEMORANDUM OPINION AND ORDER

In this 42 U.S.C. § 1983 action, Plaintiff Joshua Taylor, who suffers from atrial fibrillation, alleges that Cook County Sheriff Tom Dart, as well as Cermak Health Systems of Cook County ("Cermak") and some of its employees violated his Fourteenth Amendment rights by providing him inadequate medical care while he remained incarcerated at Cook County Jail in Chicago, Illinois. On March 23, 2020, this Court dismissed Defendants Dart, Cermak, and many of the Cermak employees pursuant to Rule 12(b)(6); but it allowed Plaintiff to proceed against Defendants Nurse Pretty and Nurse Miles for violating his constitutional rights by allegedly providing him inadequate medical care. [61]. Defendants Pretty and Miles now jointly move for summary judgment. [94]. For the reasons stated below, the Court grants their joint motion in its entirety, [94].

## I.    Legal Standard

A party seeking summary judgment must show that there exists no genuine "dispute as to any material fact and the movant is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine dispute as to a material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating a summary judgment motion, the Court must "construe all facts and reasonable inferences in the light most favorable to the nonmoving party." *Id.* Further, "a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts" since "these are the jobs for a fact finder." *Johnson v. Advocate Health and Hosps. Corp.*, 982 F.3d 887, 892 (7th Cir. 2018).

Once a party has "made a properly supported motion for summary judgment," however, "the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials that 'set forth specific facts showing that there is a genuine issue for trial.'" *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008) (quoting Fed. R. Civ. P. 56(e)). A mere "scintilla of evidence" supporting the non-movant's position does not suffice. *Anderson*, 477 U.S. at 248. Instead, "there must be evidence on which the jury could reasonable find" for the non-moving party. *Id.* at 252.

## II.    Preliminary Evidentiary Issues

As an initial matter, the Court addresses Plaintiff's challenge to the form of Defendants' evidence. According to Plaintiff, Defendants did not properly authenticate 16 of the 18 exhibits they offer because they did not submit them through an affidavit from "a person through whom the exhibits could be admitted

into evidence." [104] at 5. Specifically, on this basis, Plaintiff objects to the following exhibits attached to Defendants' Statement of Facts [96]: (1) Plaintiff's deposition transcript (Ex. A); (2) Plaintiff's "booking card" and "bed assignment sheet" (Exs. B, E); (3) Plaintiff's grievances and Jail incident reports (Exs. C, I, J); (4) Plaintiff's medical records (Exs. G, H, K); (5) video footage and still shots (Exs. N, O, P); and (6) various handbooks, policies and procedures (Exs. D, F, Q, R). According to Plaintiff, without an authenticating affidavit, Defendants have not "properly authenticated, certified, or otherwise shown" these materials "to be admissible or usable at trial" and, therefore, the Court should disregard them. [106] at 1.

Federal Rule of Civil Procedure 56(c)(1)(A) states that a party may support a factual assertion by citing to materials in the record, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purpose of the motion only), admissions, interrogatory answers, or other materials." Further, Rule 56(c)(2) states that an opposing party may object to the materials offered if "the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."

The law, however, does not require that parties submit evidence in a form admissible at trial. As Defendants point out in responding to Plaintiff's general argument, [114] at 12–15, the evidence offered at summary judgment must only "be of a *kind* admissible at trial"; it need not be in the precise form that it would be offered (or admissible), *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 921 & n.2 (7th Cir. 1994). And, although Plaintiff generally complains that Defendants failed to

3

authenticate these materials and have not "otherwise shown" them "to be admissible or usable at trial", [106] at 1, he does not offer any specific theory of inadmissibility, except as to some handbooks, policies, and procedures offered by Defendants that fail to alter today's ruling, [106] ¶¶ 20–22. Because Plaintiff offers no specific argument as to the inadmissibility of the other exhibits, the Court need not do so for him.[1]

In any event, the record presents no issue with Defendants' compliance with Rule 56(c) (except possibly as to some of the policies and procedures that Defendants offered). Specifically, as to Plaintiff's deposition (Ex. A), Rule 56(c)(1)(A) expressly contemplates use of depositions. For Plaintiff's own grievances (Ex. C), Defendants correctly note that Plaintiff authenticated them in his deposition or in verified discovery responses. [114] at 13. For Plaintiff's medical records (Exs. G, H, K), although the parties would need to lay a foundation for them at trial, Plaintiff does not argue that the contents of the records are inadmissible. Nor does he dispute the medical records' accuracy in responding to Defendants' statement of facts—to the contrary, Plaintiff relies upon the same records to admit or dispute Defendants' factual assertions and does not challenge the accuracy of the records themselves. *See* [106] ¶¶ 60–69. The same holds true for Plaintiff's booking form and bed assignment sheet, the Jail's incident reports, and the video footage (Exs. B, E, I, J, N–P). *See* [106] ¶¶ 2, 8–10, 33–40, 44–45, 47–49, 51, 58.

---

[1] Further, as Defendants point out, [114] at 14, Plaintiff himself fails to offer evidence in the manner he would impose upon Defendants. That is, he offers similar exhibits—including deposition transcripts, his medical records, and grievances—and only "authenticates" them through an affidavit from his attorney, who likely would not qualify as the person through whom Plaintiff could admit these exhibits at trial.

That leaves the policies and procedures (Exs. D, F, Q, R). Plaintiff argues that Defendants did not produce most of these in discovery and they "cannot be authenticated in any way." [106] ¶¶ 20–22.[2] If Plaintiff's assertions are true, Defendants may indeed have a hard time admitting such exhibits at trial. But the Court need not address such issues today, as these records play not part in the Court's decision on summary judgment.

Overall, the Court finds no basis to strike the other exhibits that Defendants offer in support of their motion and turns to the substance of Defendants' motion.

## III. Factual Summary[3]

Plaintiff Joshua Taylor ("Taylor" or "Plaintiff") is currently an inmate at Shawnee Correctional Center, but this lawsuit relates to when he was a pre-trial detainee of Cook County Department of Corrections ("CCDOC") housed at Cook County Jail in Chicago, Illinois. [106] ¶¶ 1–3. Cook County Health and Hospital System, also known as Cermak Health Services ("Cermak"), provides on-site routine and emergency medical care to pre-trial detainees at Cook County Jail. *Id.* ¶¶ 3, 22, 24. During the relevant time, Defendants Hilda Pretty and Beverly Miles (respectively, "Nurse Pretty" and "Nurse Miles") worked at Cermak as registered nurses. *Id.* ¶ 4.

---

[2] Plaintiff does not make this argument with respect to the Medication Admin & Distribution Policy (Ex. F) that Defendants submit and, in fact, despite his general objections to Defendants' exhibits, he admits that this policy says what Defendants say it says and that it reflects "the policies that appear in the Cook County DOC Procedures Manual Medication Administration & Distribution Policy." [104] ¶¶ 23–30.

[3] The Court draws the following facts from the parties' statements of facts, [96], [107], and responses thereto, [104], [109]. Where the parties dispute a fact, the Court also looks to record evidence.

When Plaintiff entered Cook County Jail on October 22, 2016, the Jail received medical records showing that Plaintiff suffered from a heart condition called atrial fibrillation. *Id.* ¶ 19; [109] ¶¶ 1–2. Plaintiff's claims here relate to two unrelated incidents in 2017—one involving Nurse Pretty and one involving Nurse Miles—in which he claims that the Defendants failed to adequately address his medical issues, posing significant risks given his heart condition.

### A. September 24, 2017 Incident Involving Nurse Pretty

On September 24, 2017, Plaintiff awoke with a swollen and painful right leg. [109] ¶ 7. He became concerned that he had developed a blood clot due to his heart condition. *Id.* Each tier of the Jail has a station (referred to as the "Nurses Window") where Cermak staff work, communicate with detainees and periodically administer medications. [106] ¶ 36. According to Plaintiff, he asked a Correctional Officer to ask a nurse to examine his leg and, in response, Nurse Pretty observed his leg through the glass of Plaintiff's cell block at 10:00 a.m., at which time Plaintiff claims he told her about his heart condition. *Id.*¶¶ 41–42; [109] ¶ 10. According to Plaintiff, Nurse Pretty told him that she would refer him to a doctor, but then did not. [106] ¶ 42; [109] ¶ 10. Nurse Pretty disputes that she came to Plaintiff's cell block or otherwise learned about Plaintiff's swollen leg at this time. [109] ¶ 10 (response).

Putting this initial factual dispute aside, the parties largely agree about what happened next. First, at 11:04 a.m. and 2:43 p.m., Plaintiff walked to the Nurses Window on his tier where Nurse Pretty gave him his regularly prescribed medications. [106] ¶ 43; [96-12] ¶¶ 11–12; [97] at 10–12. During these exchanges

with Nurse Pretty, Plaintiff did not mention his leg or ask for additional medical assistance.[4]  [106] ¶ 43.

Second, at approximately 3:10 p.m., Plaintiff complained to Correctional Officer S. Taylor that his leg was swollen and painful.  [106] ¶ 45.  Officer S. Taylor told Nurse Pretty who came to Plaintiff's cell block at 3:19 p.m.  *Id*. ¶ 46.  According to Plaintiff, when Nurse Pretty saw his leg, she said something like, "he ain't gonna die."  [109] ¶ 12.  Nurse Pretty disputes that she made any such comment, *id*. (response), but the parties agree that, after Nurse Pretty looked at Plaintiff's leg, she called in a referral at 3:24 p.m. for Plaintiff to go to Cermak Urgent Care for further evaluation.  [106] ¶¶ 46–47.  At 3:36 p.m., Officer S. Taylor instructed Plaintiff to get ready to go, but Plaintiff said he could not walk from the pain and asked for a wheelchair.  *Id*. ¶ 48.  Officer S. Taylor returned with a wheelchair at 3:44 p.m.; when Plaintiff stood up, he fell to the ground, hitting his head on a nearby chair.  *Id*. ¶ 49.  Officers helped him up, and Nurse Pretty and other medical staff took his vital signs, helped him onto a gurney, and took him to Cermak Urgent Care for evaluation.  *Id*. ¶¶ 50–51.

---

[4] Plaintiff attempts to dispute the Defendants' assertion that "[n]o other medical assistance [was] requested [*sic*] at either administration time by Taylor," [106] ¶ 43 (response), but he fails to cite anything to dispute it.  Instead, he merely states that he "complained to Nurse Pretty of numbness and swelling in his leg at or around 10:00 am on September 24, 2017, and again at or around 3:00 p.m. that same day, requesting medical assistance each time."  *Id*.  The Court has already addressed the alleged 10:00 a.m. incident and will address the 3:00 p.m. incident in due course.  Even according to Plaintiff's version of events, however, these alleged 10:00 a.m. and 3:00 p.m. interactions with Nurse Pretty remain distinct from the 11:04 a.m. and 2:43 p.m. interactions.  [106] ¶¶ 43, 45–46; [109] ¶¶ 10–11.  Accordingly, the Court deems admitted Defendants' statement that, when Nurse Pretty gave Defendant his medications at 11:04 a.m. and 2:43 p.m., he did not complain about his leg or request additional medical assistance.

At Cermak Urgent Care, medical staff recorded a normal heart rate and rhythm. *Id.* ¶ 53. But they referred Plaintiff to John Stroger Hospital ("Stroger") at 5:48 p.m. for possible Blunt Head Trauma ("BHT") from his fall. *Id.* A doctor examined him at Stroger, noting a recent history of BHT, possible loss of consciousness ("LOS"), and a self-reported history of lower left extremity deep vein thrombosis ("DVT"). *Id.* ¶ 54. Doctors performed a cardio check and found a regular heart rate and rhythm, no murmur, and normal peripheral perfusion. *Id.* ¶ 56. Doctors also performed a leg ultrasound but found no DVT or clots. *Id.* ¶ 57. They recommended, however, that Plaintiff remain at the hospital overnight for observation because of possible BHT and LOC and to conduct a follow-up head CT scan. *Id.* ¶ 55. The hospital discharged him to the Jail on September 25, 2017. *Id.*

### B. November 13, 2017 Incident with Nurse Miles

The second incident, which forms the basis for Plaintiff's claim against Nurse Miles, occurred on November 13, 2017, and involves dispensation of prescription medications. As a general matter, the process for preparing and dispensing prescriptions to detainees is as follows. The Cermak pharmacy prepares and prepackages the prescribed medication for each detainee. When it is time to administer medications, detainees line up outside the Nurses Window for their medication. [106] ¶ 23. When each detainee gets to the Nurses Window, the nurse scans the detainee's identification card into CCDOC's database, which brings up the detainee's information and prescribed medication list. *Id.* ¶¶ 24–25. The nurse then visually matches the detainee's face and ID card to the information in CCDOC's database to confirm his identity. *Id.* Finally, after confirming the detainee's identify,

8

the nurse hands him the pre-packaged medication and records the administered medication. *Id.* ¶¶ 27–28.

On November 13, 2017, Plaintiff underwent dental work. [109] ¶ 19. Later that afternoon, he went to the Nurses Window for his prescribed medications, where Nurse Miles was handing out medications. *Id.* ¶ 20. When he got to the Nurses Window, Nurse Miles scanned his identification card. *Id.* ¶ 21. According to Plaintiff, she handed him an unfamiliar pill, which he took assuming it was ibuprofen for pain from his dental work. *Id.* ¶ 22. But, again according to Plaintiff, after he took it, Nurse Miles told him that she had, in fact, accidentally given him a drug called Gabapentin meant for a different detainee with the same last name, Patrick Taylor. *Id.* ¶¶ 22, 27. Plaintiff further claims that, after Nurse Miles told him this, she merely said, "you'll live" and asked him to leave. *Id.* ¶ 28. Plaintiff next claims that, after leaving the Nurses Window, he began to feel hot and woozy. *Id.* ¶ 29.

Nurse Miles disputes Plaintiff's account, insisting that she did not give him the wrong medication or make those comments, and, in fact, has never given the wrong medication to a patient. *Id.* ¶¶ 22, 27–28 (responses). Putting this factual dispute aside for the moment, the parties agree that, after Plaintiff left the Nurses Window, he went to take a shower, where he fell and hit his head. *Id.* ¶ 29; [106] ¶ 67. Nurse Miles provided Plaintiff immediate medical care in the shower area at approximately 2:35 p.m. [106] ¶ 68. While she helped him in the shower, Plaintiff said that he believed that the Gabapentin made him woozy and caused him to fall. [106] ¶ 68.

9

Because Plaintiff hit his head when he fell, Nurse Miles referred him to Cermak Urgent Care at 2:41 p.m. *Id.* ¶¶ 69–70. A doctor evaluated Plaintiff and recorded that he had a normal heart rate and rhythm, that his pupils were equal, round and reactive to light with intact extraocular movements, and that his appearance revealed no apparent distress. *Id.* ¶¶ 71–72. The medical notes also state that Plaintiff complained of trauma and dizziness from the fall and that he had been given Gabapentin by mistake. *Id.* ¶¶ 70–71. The doctor offered Plaintiff pain medication, which he refused, and then sent him back to his Jail division. [106] ¶ 73.

## IV. Analysis

Plaintiff claims that Defendants Nurse Pretty and Nurse Miles violated his constitutional rights by failing to respond to his serious medical needs on September 24, 2017, and November 13, 2017, respectively.

Here, because Plaintiff was a pre-trial detainee at the time, the Fourteenth Amendment's Due Process clause governs his claims. *See Miranda v. Cnty. of Lake*, 900 F.3d 335, 350 (7th Cir. 2018). Nonetheless, Plaintiff couches many of his arguments in response to Defendants' motion using Eighth Amendment jurisprudence, [104], which governs medical care claims by inmates after conviction, *see Miranda*, 900 F.3d at 350 (discussing the Eighth Amendment's application after conviction). Plaintiff acknowledges this error but insists that it remains proper to rely on Eighth Amendment cases because pretrial detainees "are entitled to *at least* as much protection as the constitution provides convicted prisoners under the 8th Amendment" and it "is 'convenient and entirely appropriate to apply the same

10

standard to claims arising under the Fourteenth Amendment (detainees) and Eighth Amendment (convicted prisoners) without differentiation.'" [104] at 8 (quoting *Board v. Farnham*, 394 F.3d 469, 477 (7th Cir. 2005)).

The Court agrees that "pretrial detainees are entitled to *at least* as much constitutional protection as the constitution provides convicted prisoners." *Board*, 394 F.3d at 477 (emphasis in original). Based upon this principle, this circuit historically often assessed pretrial detainees' medical care claims using the Eighth Amendment "deliberate indifference" subjective standard, which requires proof that a defendant had a "sufficiently culpable state of mind" and asks whether the defendant "actually believed there was a significant risk of harm." *Miranda*, 900 F.3d at 350 (quoting *Pittman ex rel. Hamilton v. Cnty. of Madison*, 746 F.3d 766, 775–76 (7th Cir. 2014)).

This changed, however, after the Supreme Court issued *Kingsley v. Hendrickson*, 576 U.S. 389 (2015). In *Kingsley*, which involved a pretrial detainee's excessive force claims, the Court "disapproved the uncritical extension of Eighth Amendment jurisprudence to the pretrial setting." *Miranda*, 900 F.3d at 351 (discussing *Kingsley*, 576 U.S. at 395–04). The Court emphasized that "pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less maliciously and sadistically," *Kingsley*, 576 U.S. at 395. Accordingly, the Court rejected the Eighth Amendment's subjective intent standard for Fourteenth Amendment excessive force claims and instead set out a two-part "objectively reasonable" standard. *Id.* For the first step, a detainee must establish a defendant's

11

"state of mind with respect to his physical acts," and show that the defendant acted purposefully or knowingly, rather than accidentally or negligently. *Id.* at 396. For the second step, however, a "pretrial detainee must only show that the force purposely or knowingly used against him was objectively unreasonable." *Id.* at 396–97. Thus, unlike Eighth Amendment claims, subjective beliefs about the extent of the force are irrelevant. *Id.*

Although *Kingsley* involved an excessive-force claim, the Seventh Circuit (and some other circuits) have extended its objective standard to other types of Fourteenth Amendment claims by pretrial detainees, including claims for inadequate medical care, *Miranda*, 900 F.3d at 351 (discussing a circuit split), conditions of confinement, *Hardeman v. Curran*, 933 F.3d 816 (7th Cir. 2019), and failure to protect, *Kemp v. Fulton County*, 27 F.4th 491 (7th Cir. 2022).

As to medical care claims like Plaintiff's claims here, the Seventh Circuit has described the two-part objective standard as follows: the first step "asks whether the medical defendants acted purposefully, knowingly, or perhaps even recklessly when they considered the consequences of their handling of [plaintiff's] case." *McCann v. Ogle Cnty., Ill.*, 909 F.3d 881, 886 (7th Cir. 2018) (quoting *Miranda*, 900 F.3d at 353). This step—which still considers the defendant's state of mind—"encompasses all states of mind except for negligence and gross negligence." *Pittman by & through Hamilton v. Cnty. of Madison, Ill.*, 970 F.3d 823, 827–28 (7th Cir. 2020). As another district court explained, this first "state-of-mind requirement is measured against each defendant's *actions* (that is, whether they intentionally or recklessly engaged in

12

the action), rather than their subjective views of the risks of the allegedly inadequate medical care." *Gaston v. Beatty*, No. 17-CV-1798, 2020 WL 1288878, at *4 (N.D. Ill. Mar. 18, 2020). The second step then asks "whether the challenged conduct was objectively reasonable." *McCann*, 909 F.3d at 886. This step looks at "the totality of facts and circumstances faced by the individual alleged to have provided inadequate medical care to gauge objectively—without regard to any subjective belief held by the individual—whether the response was reasonable." *Id*. This step also considers whether the complained-of medical condition qualifies as "an objectively serious medical condition." *Williams v. Ortiz*, 937 F.3d 936, 942 (7th Cir. 2019).

Accordingly, while it remains true that pretrial detainees enjoy at least as much constitutional protection as convicted inmates (and Eighth Amendment claims for inadequate medical treatment may still offer some limited guidance), the standard differs for evaluating Fourteenth Amendment Due Process claims for inadequate medical care.

### A.   Plaintiff's Claim Against Nurse Pretty for his September 24, 2017 Leg Swelling

Plaintiff's claim against Nurse Pretty relates to how she addressed his alleged leg swelling on September 24, 2017. In moving for summary judgment, Nurse Pretty first insists that she did not learn about Plaintiff's leg condition until 3:19 p.m. and that, upon learning of his condition, she took objectively reasonable action. [95] at 8.

Plaintiff's testimony provides the only evidence that Nurse Pretty learned of his leg swelling at 10 a.m. Nurse Pretty denies it. Plaintiff does not offer testimony from the correctional officer that he allegedly told about it. Nor does he identify any

13

jail or medical records showing that he complained of leg swelling at 10 a.m. Ultimately, however, whether Nurse Pretty first learned of Plaintiff's leg swelling at 10 a.m. (as he contends) or at 3:19 p.m. (as she contends) remains a credibility determination that a jury, not the Court, must make.[5]  *See Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) ("a self-serving affidavit is an acceptable method for a non-moving party to present evidence of disputed material facts").  Thus, Nurse Pretty is not entitled to summary judgment on that basis.

Instead, the Court credits Plaintiff's version of the facts on this point and assumes for purposes of this motion that Nurse Pretty came to Plaintiff's cell at 10 a.m., viewed his leg through the glass, and did not take further action until 3:19 p.m. This disputed evidence, if believed, may suffice to establish the first step of the "objectively reasonable" inquiry since one could reasonably conclude that Nurse Pretty purposely or knowingly did not provide Plaintiff medical care at 10 a.m.[6]

---

[5] If Nurse Pretty did not learn of Plaintiff's leg swelling until 3:19 p.m., then Plaintiff cannot plausibly establish objectively unreasonable medical care.  That is, even if Nurse Pretty commented that Plaintiff "ain't gonna die" at 3:24 p.m.—which she disputes—Plaintiff agrees that: (1) Nurse Pretty checked his leg at 3:19 p.m. and referred him to Cermak Urgent Care at 3:24 p.m.; (2) Plaintiff requested a wheelchair to go to Cermak Urgent Care at 3:36 p.m.; (3) a guard brought the wheelchair at 3:44 p.m. but Plaintiff fell getting into it; and (4) Nurse Pretty and others immediately checked his vitals and took him by gurney to Cermak Urgent Care for his leg and a possible head injury.  Nothing about this timeline suggests an objectively unreasonable response to Plaintiff's complained-of leg swelling.  In fact, it shows just the opposite.  Further, if Nurse Pretty first learned of his leg at 3:19 p.m., then the fact that Plaintiff fell does not render her care objectively unreasonable since he does not claim that anything Nurse Pretty did (or did not do) after 3:19 p.m. caused him to fall. For example, he does not claim that he asked Nurse Pretty (or anyone else) to help him stand and they refused.  To the contrary, he agrees that he asked for, and got, a wheelchair.

[6] Even assuming Nurse Pretty saw Plaintiff's leg at 10 a.m., step 1 still remains a disputed issue.  For step 1, Plaintiff needs to establish that Nurse Pretty's response (or lack of a response) was knowing, purposeful or at least reckless.  Mere negligence or gross negligence will not suffice. *Pittman*, 970 F.3d at 827–28.  One could conceive of many reasons for Nurse Pretty's alleged inaction that would indicate only negligence or gross negligence. This illustrates one of the practical challenges with the Fourteenth Amendment objective standard for medical care claims—while a defendant's state-of-mind may not guide the step 2 reasonableness inquiry, a defendant's reasons for failing to provide care may matter

Plaintiff's claim falters, however, at the second step—the objective reasonableness of Nurse Pretty's actions. As discussed above, "objective reasonableness" considers "the totality of facts and circumstances faced by the individual alleged to have provided inadequate medical care and to gauge objectively—without regard to any subjective belief held by the individual—whether the response was reasonable." *McCann*, 909 F.3d at 886. As part of this inquiry, Plaintiff must also establish that his medical condition qualifies as objectively serious. *Williams*, 937 F.3d at 942. Because Plaintiff alleges that Nurse Pretty unreasonably delayed getting him medical care, he must also present "verifying medical evidence that the delay in medical care caused some degree of harm." *Miranda*, 900 F.3d at 347. Such "verifying medical evidence" often comes in the form of expert testimony, but "medical records alone" may suffice. *Id*.

As to objective reasonableness, Nurse Pretty argues that, even if she learned of Plaintiff's leg swelling at 10 a.m., Plaintiff waited less than six hours for treatment, which remains objectively reasonable and, although he fell, she bears no responsibility for the fall. [95] at 8–12. She also argues that doctors found no injury to his leg that required treatment and no blood clot or damage to his heart from the leg swelling. *Id*. Simply put, she argues that there exists no evidence that any delay

---

for evaluating negligence or gross negligence under step 1. *Cf. Strain v. Regalado*, 977 F.3d 984, (10th Cir. 2020) (declining to extend *Kingsley* to medical care claims based on failure to act/deliberate indifference because *Kingsley*'s standard does not fit with an alleged failure to act since "a person who unknowingly fails to act—even when such a failure is objectively unreasonable—is negligent at most."); *Terry v. Cnty. of Milwaukee*, 357 F. Supp. 3d 732, 744 (E.D. Wis. 2019) (commenting that the Seventh Circuit's *Miranda* standard for medical mistreatment claims "created a doctrine that is difficult to apply" because if "we must assess a jail doctor's conduct objectively, how can we ask whether the doctor was 'reckless' with respect to the consequences of his actions?").

caused Plaintiff harm. [114] at 7. In response, Plaintiff argues that Nurse Pretty's alleged inaction at 10 a.m. was "objectively unreasonable" because it (1) "put him at risk of serious health complications" due to his atrial fibrillation condition, and (2) caused him "hours of unnecessary pain and suffering." [104] at 9.

The Court first considers whether there exists a triable issue of fact on whether the alleged delay put him at serious risk of health complications from his atrial fibrillation condition. As a preliminary point, Plaintiff insists, and Defendants do not dispute, that atrial fibrillation constitutes an objectively serious medical condition. But this focuses on the wrong condition. Plaintiff's atrial fibrillation does not automatically transform every ill Plaintiff suffers into an objectively serious condition requiring an emergency response. Instead, Plaintiff must establish that his leg swelling constitutes an objectively serious medical condition *and* that an alleged delay in treating his leg swelling caused him risk of harm that made any delay objectively unreasonable.

The Seventh Circuit made this precise point in *Jackson v. Pollion*, 733 F.3d 786 (7th Cir. 2013), which involved a prisoner with early-stage hypertension who claimed that doctors violated his Eighth Amendment rights when they did not give him blood pressure medication for three weeks. The parties and lower court had focused on whether hypertension constitutes an objectively serious medical issue and agreed it did. *Id*. at 789–90. The Seventh Circuit held, however, that the issue "was not hypertension but the medical consequences" from "a three-week deprivation of medicine for mild, early-stage hypertension." *Id*. at 790. The court continued: "No

16

matter how serious a medical condition is, the sufferer cannot prove tortious misconduct (including misconduct constituting a constitutional tort) as a result of failure to treat the condition without providing evidence that the failure caused injury or a serious risk of injury. For there is no tort—common law, statutory, or constitutional—without an injury, actual or at least probabilistic." *Id.*

Here, Plaintiff insists that immediate treatment of leg swelling remains essential for someone with atrial fibrillation because it could indicate a blood clot. [104] at 10. But he submits no evidence to support this theory, let alone "verifying medical" evidence. For example, he does not offer an expert opinion about medical treatment of swollen legs in patients with atrial fibrillation or the likelihood of a blood clots; nor does he offer testimony from treating physicians or any medical records.

Instead, he points to Nurse Pretty's testimony, [104] at 10 (citing [107] ¶ 4), arguing that Nurse Pretty testified that "if a patient who suffers from atrial fibrillation complains of swelling in their legs, that could indicate a blood clot or other serious medical issue requiring evaluation by a doctor," [107] ¶ 4. Not so. Rather, Nurse Pretty testified that she believed a patient with atrial fibrillation who complains of leg swelling should see an in-house doctor for evaluation but that "swelling in the leg is not unusual," could just "be part of the symptoms of having afib," and "would not automatically be considered a life threating situation if that makes sense, especially if you're on medications already." [105] (Ex. D at 75:15–76:1). Thus, Nurse Pretty's testimony—even if it qualifies as verifying medical evidence—

does not indicate how urgently a patient must see a doctor; nor could one reasonable conclude from this testimony that a six-hour delay is objectively unreasonable.

Further, even if Plaintiff feared that his swollen leg signaled a serious medical issue related to his heart, the medical records show that it did not. At Cermak Urgent Health, he had a normal heart rhythm and vitals. And at Stroger Hospital (where he went for possible blunt force trauma from his fall, not because of his leg swelling), medical staff did not find any issues with his heart or leg—he still had normal vitals, and they found no blood clots and no deep vein thrombosis. Plaintiff also points to no treatment he received for his leg swelling other than these diagnostic tests. Accordingly, he has not shown that he suffered any actual (or even a serious risk of) physical harm from his leg swelling. Plaintiff bears the burden to establish that it was objectively unreasonable for him to wait six hours to see a doctor about leg swelling given his atrial fibrillation condition. And he has failed to present evidence to meet his burden.

This leaves his allegation that the delay caused him "hours of unnecessary pain and suffering." [104] at 9. "Harm" caused by delay may include "needless suffering" "exacerbated by" a failure to provide adequate medical care. *Gayton v. McCoy*, 593 F.3d 610, 624 (7th Cir. 2010). In arguing that his alleged pain suffices to create constitutional liability, Plaintiff analogizes his case to *Williams v. Liefer*, 491 F.3d 710 (7th Cir. 2007). *See* [104] at 12. *Williams* involved an inmate with high blood pressure who awoke with chest pain, left arm numbness and dizziness, and began vomiting. 491 F.3d at 712. He complained to correctional officers multiple times, but

18

they ignored him. *Id.* A few hours later, during a routine cell change to a different prison building, the inmate again asked to see a doctor. Officers not only ignored him but made him move his personal belongings that weighed over 200 pounds. *Id.* at 713. As he pushed his belongings to a storage area, he complained again of severe chest pain and began sweating profusely, but officers still ignored his requests for medical help. *Id.* He also asked for help carrying his boxes due to his pain. They refused. *Id.* Finally, a few hours later, the officers made the inmate climb stairs to his new cell carrying his 200-pound box of personal belongings; he blacked out on the stairs, falling backward. *Id.* Medical staff rushed him to the emergency room, where he received nitroglycerin that "quickly relieved his pain" but he remained in the infirmary for six days. *Id.* at 713. The Seventh Circuit held that a reasonable jury could find that the delay in treating him "unnecessarily prolonged and exacerbated" his "pain and unnecessarily prolonged his high blood pressure." *Id.* at 716.

This case, however, is not *Williams*. First, in *Williams*, the court emphasized that the "medical records indicate that the nitroglycerin almost immediately relieved his pain and lowered his blood pressure, so a jury could find that" the delay caused him "six extra hours of pain and dangerously elevated blood pressure for no good reason." *Id.* Here, in contrast, Plaintiff does not present evidence that an earlier visit to a doctor would have alleviated his pain from leg swelling. In fact, although Cermak Urgent Care and Stroger Hospital ran diagnostic tests, Plaintiff does not identify anything that they did to treat or alleviate his leg swelling or attendant pain; instead, as best the Court can tell, the swelling (and any pain) subsided on its own.

19

Second, in *Williams*, the inmate complained repeatedly about his pain over the course of the six-hour delay. Not so here. Instead, even if Plaintiff complained to Nurse Pretty at 10 a.m., he admits that he saw her again at 11:04 a.m. and 2:43 p.m. to get his routine medications and did not mention his leg swelling or pain either time; nor did he ask for a doctor referral at any time. These interactions prove significant for multiple reasons. Beyond any credibility issues which might be raised about Plaintiff's claims about his pain level,[7] the record fails to support Plaintiff's attack on the objective reasonableness of Nurse Pretty's alleged inaction. For, even if Plaintiff complained to Nurse Pretty about leg swelling and pain at 10 a.m. and she did not do anything, he admits that he had the opportunity to reraise the complaint with her but did not. Plaintiff fails to explain how his conduct, viewed in totality, would suggest to a reasonable medical professional that he suffered acute pain requiring immediate medical attention.

That leaves Plaintiff's fall and suspected head injury. Here, again, Plaintiff needs to tie his fall to an objectively unreasonable delay in medical treatment related to his leg swelling. Once again, Plaintiff fails to present any "verifying medical evidence" showing that delays in treating his leg swelling lead to a fall. Instead, he seems to rely on timing, since he fell when he stood to get in a wheelchair. While proximate cause is often left for a jury to determine, a temporal connection without

---

[7] As to pain level, Plaintiff claims that he suffered so much pain that he could not walk. [107] ¶ 7. The evidence refutes this contention: he admits that he walked up to the Nurses Window to get his medications at 11:04 a.m. and 2:43 p.m., and video evidence of the jail's common area shows Plaintiff walking around as late as 2:46 p.m. [101]. The Court thus need not credit Plaintiff's assertion. *See Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2018) (holding that if video footage clearly contradicts a non-movant's assertions, then a court need not "indulge stories clearly contradicted by the footage.").

more rarely suffices to create a triable issue of fact. As another court recently noted, "argument grounded only in a temporal sequence is insufficient to survive summary judgment, at least in a case like this one involving a physical injury with other potential causes." *Paredes v. Cook Cnty.*, No. 15 C 3644, 2018, 2018 WL 4955865, at *4 (N.D. Ill. Oct. 12, 2018) (citing *Abebe v. Thermo Fisher Sci., Inc.*, 711 F. App'x 341, 342 (7th Cir. 2018) ("[P]ost hoc ergo propter hoc is not a reliable means of showing causation.") and *Glatt v. Chi. Park Dist.*, 87 F.3d 190, 194 (7th Cir. 1996) (discussing the insufficiency of causation arguments based on "post hoc ergo propter hoc: the [action] followed the [purported cause], therefore must have been caused by it")).

Yet, even if Plaintiff fell because of his leg pain or swelling, Plaintiff has still not marshalled evidence to suggest that Nurse Pretty unreasonably delayed referring him to a doctor considering the "totality of facts and circumstances" that she faced. As discussed, he did not present verifying medical evidence that his leg swelling warranted immediate attention because of a risk of falling or any other risks. And, even if he told Nurse Pretty at 10 a.m. that his leg hurt, he did not complain to her about pain or difficulty walking when he saw her again 11:06 a.m. or 2:43 p.m. Nor did he complain to anyone else. The fact that he fell in the afternoon does not *post hoc* make her earlier conduct objectively unreasonable. Even crediting disputed facts in Plaintiff's favor, he fails to identify "evidence on which the jury could reasonable find" in his favor on his claim against Nurse Pretty. *Anderson*, 477 U.S. at 248. Accordingly, she is entitled to summary judgment.

21

B.    **Alleged November 13, 2017 Medication Error By Nurse Miles**

The Court now turns to Plaintiff's claim against Nurse Miles for allegedly giving him Gabapentin on November 13, 2017, and failing to address the error.  Nurse Miles argues that she is entitled to summary judgment because Plaintiff lacks evidence that she gave him Gabapentin, and, even if she did, a single medication error suggests, at best, negligence.  She also argues that Plaintiff cannot establish that he suffered any injury other than his "accidental" fall in the shower, which he cannot causally connect to the administration of Gabapentin.  [95] at 12–15.

Whether Nurse Miles gave Plaintiff Gabapentin on November 13, 2017 remains a disputed issue of fact that the Court cannot resolve on summary judgment. Nurse Miles insists that she has never given any patient the wrong medication.  But Plaintiff offers evidence to create at least an issue of fact.  First, he posits that Nurse Miles confused Plaintiff with another detainee with the same last name, Patrick Taylor, who takes Gabapentin and stood near Plaintiff in the medication line that afternoon.[8]  Plaintiff also claims that Nurse Miles handed him an unfamiliar pill, which he assumed was ibuprofen for pain from his dental procedure earlier that day. He further claims that, after he took this unfamiliar pill, Nurse Miles told him that she had mistakenly given him Gabapentin.  Plaintiff repeated this assertion to

_____

[8] The parties also dispute whether medication dispensation records for him and Patrick Taylor suggest a medication mix-up.  Plaintiff points to records that show that (1) at 9:03 a.m., Patrick Taylor's Gabapentin medication is marked as "unscannable"; and (2) at 8:52 p.m., Plaintiff's amiodarone medication is marked as "unscannable."  [109] ¶¶ 25–26.  If a medication does not belong to a specific patient, the medication will not scan in the electronic medication dispensing system. [109] ¶ 23. Nurse Miles argues that one cannot infer anything from these records, since Plaintiff only accuses Nurse Miles of giving him the wrong medication in the afternoon, not around 9:03 a.m. or 8:52 p.m.  [108] at 10–11.  Whatever the significance of these records, the Court finds that other evidence creates a material issue of fact on whether Nurse Miles gave Plaintiff Gabapentin that afternoon.

22

doctors at Cermak Urgent Care, which adds credibility to his statement, making summary judgment inappropriate on this basis.

Next, Nurse Miles argues that, even if she gave Plaintiff the wrong medication, this suggests negligence at most. [95] at 14. This argument, however, misconstrues Plaintiff's claim. Plaintiff does not allege a constitutional violation against Nurse Miles just for giving him Gabapentin by mistake. Rather, he alleges that she gave him Gabapentin by mistake, realized it, and then merely said, "you'll live" and told him to leave, rather than provide him medical treatment for a potentially dangerous drug reaction given his atrial fibrillation. Taking Plaintiff's version of events as true, this suffices to create a disputed issued of fact on step 1 of the objective inquiry. A reasonable jury could find that Nurse Miles acted knowingly or purposefully when she realized her mistake.

Nonetheless, at step 2—the objective reasonableness of Nurse Miles' actions— the Court agrees that Plaintiff faces an insurmountable evidentiary problem. Not every mistakenly administered medication poses the same risks. Yet, Plaintiff offers no evidence about the dangers that Gabapentin may pose to someone who takes it one time by mistake or to someone who has atrial fibrillation. He offers no expert opinions, no medical reports, and no treating physician testimony.

Instead, for purposes of responding to Defendants' motion, Plaintiff insists that when he went to Cermak Health after falling in the shower, "he had 'sky high vitals' and a doctor told him that the drug mixture he ingested is known to cause a dangerous reaction." [109] ¶ 30 (disputed). The evidence he cites—a November 13,

2019 grievance [105-1] (Ex. B) and Defendants' Answer to paragraph 62 of his Complaint, [67] ¶ 62—does not support this assertion, however. Rather, his November 13, 2019 grievance only states that he had "sky high vitals," [105-1] at 38 (Ex. B). Similarly, paragraph 62 of his Complaint, which Defendants denied in their Answer, merely asserts that "Taylor was taken to Cermak with dangerously high vital signs." [67] ¶ 62.[9] Even if this evidence established that Plaintiff had "sky high vitals"—and it does not—it says nothing about possible Gabapentin risks or interactions and does not establish that the alleged sky-high vitals resulted from the Gabapentin.

Plaintiff also fails to identify any treatment he received at Cermak Urgent Care that suggests doctors had concerns about a possible dangerous drug interaction from Gabapentin. Although doctors knew Plaintiff believed he accidently took Gabapentin, they noted no concerns in the record. Instead, a doctor merely recorded that Plaintiff had a normal heart rate and rhythm, normal pupils, and showed no signs of distress; offered Plaintiff some pain medication, which he refused; and then sent Plaintiff back to his Jail division.

---

[9] Perhaps Plaintiff meant to cite Defendants' Answer to Paragraph 63 of his Complaint, which alleged that "[a]t Cermak, Taylor was advised by a doctor that the drug mixture he had been given is known to produce a dangerous drug interaction and reaction." [67] ¶ 63. If so, this still would not suffice since (1) Defendants' Answer denies the allegation, *id.*, and (2) Plaintiff may not rely on allegations in his complaint to survive summary judgment, *see Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) (holding that "a party opposing summary judgment may not rely on allegations in her pleadings."). Further, even if Plaintiff had offered his own testimony about what a doctor allegedly told him, there exist numerous hearsay problems with such testimony that likely make it inadmissible for its truth. *See Youngman v. Peoria Cnty.*, 947 F.3d 1037, 1043 (7th Cir. 2020) (holding that Plaintiff may not establish a causal link between his disability and alleged motion sickness through his own testimony about what a doctor told him, since such testimony "amounts to hearsay which is beyond the limited exception set forth in Federal Rule of Evidence 803(4) for statements that patients make to their physicians for purposes of medical diagnosis or treatment.")

24

That leaves Plaintiff's fall in the shower. Plaintiff insists that he fell because the Gabapentin made him feel "hot and woozy." [104] at 14. As the Court discussed above with respect to Nurse Pretty, however, "post hoc ergo propter hoc is not a reliable means of showing causation." *Abebe*, 711 F. App'x at 342; *see also Glatt*, 87 F.3d at 194 (same). Without some evidence about Gabapentin and its potential side effects or risk factors, this Court (and, in turn, a jury) can only speculate that Plaintiff's hot and woozy condition resulted from the Gabapentin.

Plaintiff identifies no evidence from which a jury could find that he faced a risk from mistakenly taking Gabapentin one time, or that he fell in the shower because of an adverse reaction to Gabapentin. Plaintiff's mere speculation will not suffice to create an issue of fact to save his claim. Accordingly, he offers no evidence from which a jury could determine that Nurse Miles acted objectively unreasonably in failing to get Plaintiff medical treatment when she allegedly realized she gave him Gabapentin by mistake. As a result, Nurse Miles is entitled to summary judgment.

## V.    Conclusion

For the foregoing reasons, the Court grants Defendants' joint motion for summary judgment [94] and directs the Clerk to enter judgment in favor of both Defendants and against Plaintiff.

Dated: September 27, 2022          Entered:

John Robert Blakey
United States District Judge

25